# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**DANIEL LEE WAKEFIELD,**

    **Plaintiff,**

    v.                                             Case No. 12-CV-1193

**WHEATON FRANCISCAN HEALTHCARE ALL SAINTS,
WARDEN JOHN PAQUIN, AAISHA SHAKOOR,
and JOHN DOE,**

    **Defendants.**

---

## DECISION AND ORDER

Plaintiff, Daniel Lee Wakefield, a Wisconsin state prisoner, filed this pro se civil rights action under 42 U.S.C. § 1983. He is proceeding in forma pauperis on Eighth Amendment claims for failure to protect and deliberate indifference to a serious medical need. His claims are based on allegations that he inadvertently consumed another inmate's blood on a meal tray and the subsequent medical care he received. Defendants Warden John Paquin and Aaisha Shakoor[1] have filed a motion for summary judgment. Defendant Wheaton Franciscan Healthcare–All Saints, who is represented by separate counsel, has also filed a motion for summary judgment. For the reasons set forth herein, defendants' motions will be granted and this case will be dismissed.[2]

---

[1] Aaisha Shakoor is now known as Aaisha Flint. I will refer to her as Shakoor-Flint in this Decision and Order.

[2] Defendant John Doe will be dismissed because plaintiff has not identified him.

# I. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

**II. FACTS**[3]

Plaintiff is an inmate at Racine Correctional Institution (RCI). At all times relevant, defendant Paquin was the Warden at RCI. As Warden, he was responsible for the overall administration and operation of the institution. Defendant Paquin is now employed by the Wisconsin Department of Corrections (DOC) as an Assistant Administrator in the Division of Adult Institutions.

Defendant Shakoor-Flint is employed by the DOC as a Nursing Supervisor at RCI. In that capacity, she functions as the administrative supervisor of the Health Services Unit (HSU) during the absence of the Health Services Director; assumes responsibility for planning, implementing, and evaluating clinical programs to advance patient care and nursing practices for RCI; plans, implements, and evaluates clinical programs to advance patient care and nursing practices for RCI; plans and participates in learning opportunities for nursing and ancillary staff; works with administration and practitioners to assure quality patient care and promotes education; and collaborates with and receives clinical direction from the Clinical Directors and Nursing Coordinators of the Bureau of Health Services (BHS), RCI Physicians and Psychiatrists, and Dentists.

Amandy Moore (Nurse Moore) is employed by the DOC as a Nursing Clinician 2 at RCI in the HSU. In that capacity, he provides skilled nursing care to incarcerated adults in state correctional facilities, including both ambulatory and infirmary settings. Nurse Moore's duties include patient assessment and treatment, assisting the physician in

---

[3] This section is taken from defendants Paquin and Shakoor-Flint's Proposed Findings of Fact, which defendant All Saints adopts in support of its summary judgment motion. Facts are also taken from plaintiff's Proposed Findings of Fact.

3

providing medical services, management of medications, provisions of emergency care, and maintenance of medical records. In addition, he participates in educational programs for staff and inmates and participates in activities to maintain his nursing skill level.

On July 23, 2012, while eating supper, plaintiff was informed by other inmates that the food trays had blood on them. Later that day, plaintiff went to the HSU and stated that he had eaten blood drops on his meal tray. He complained of stomach cramping and nausea. Plaintiff alleges, "I noticed red spots on the tray but paid no attention thinking they were just apple shavings from the apple given to us." (Complaint at 4.) Nurse Moore was working in HSU at that time.

In response to plaintiff's assertion that he ingested another inmate's blood, the DOC policy regarding blood exposure was reviewed.[4] Plaintiff was assessed, his vaccination

---

[4] The DOC Health Services Policy/Procedure 300:36 governs the procedures regarding Significant Exposures Management. According to the policy, the definition of a significant exposure is:

> Defined § 252.15(1)(em) as sustained contact which carries a potential for transmission of HIV, by one or more of the following: a) by transmission into a body orifice or onto mucous membrane, b) exchange during the accidental or intentional infliction of a penetrating wound, c) exchange into an eye, an open wound, an oozing lesion or where a significant breakdown in the epidermal barrier has occurred of blood; semen; vaginal secretion; cerebrospinal, synovial, pleural, peritoneal, pericardial, or amniotic fluid; or other body fluid that is visible contaminated with blood.

(Shakoor-Flint Aff. ¶ 7, Exh. 101 at 3.) As soon as HIV is exposed to air, the virus starts to die, particularly if there is only a small quantity of a bodily fluid. The response to managing exposures is to:

> a) Give immediate first aid at the nearest sink;
> b) Notify the appropriate facility staff of the incident;
> c) Do a medical evaluation in order to determine if the exposure is significant;
> d) Complete a DOC-98A; and
> e) Testing.

record was reviewed, and he received education regarding possible risks associated with exposure to blood/blood borne pathogens. His lab work was drawn the following day and he was scheduled for a follow-up appointment with RCI nursing staff.

Prior to speaking with the inmates on July 23, 2012, Nurse Moore was informed that defendant All Saints was contacted regarding the potential blood exposure and that hospital staff would not treat the inmates because the amount of blood they ingested was small and stomach acids would minimize the exposure. Nurse Moore then explained to the inmates who claimed to have ingested the blood that they would not be going to the Emergency Room. Nurse Moore vaguely remembers discussions he had with plaintiff on July 23, 2012. He believes that he repeated to plaintiff exactly what was related to him, which was that the hospital was called and informed of the incident but that staff at the hospital declined to triage/assess the inmates who had ingested the blood because anything that would be done at the hospital for blood exposure could be done at RCI.

On July 23, 2012, Nurse Hawkins informed defendant Shakoor-Flint that defendant All Saints was contacted regarding the potential blood exposure and that hospital staff would not treat the inmates who ingested food that had drops of blood on it because the amount of blood that was ingested was small and that stomach acids would minimize the exposure. Defendant All Saints does not have a medical record that confirms such a call took place because plaintiff was not admitted to the hospital.

The decision not to send plaintiff to the hospital was based on the nurse's assessment and the Emergency Room personnel. Based on the assessment of the

---

(Shakoor-Flint Aff. ¶ 9, Exh. 101 at 3.)

5

inmates that ingested the drops of blood, it was determined that they had not ingested enough blood to warrant transfer to the Emergency Room. As protocol dictates, labs for HIV tests were drawn by DOC staff.

On July 23, 2012, the day of the incident, a nurse in HSU saw plaintiff. His vitals were taken and within normal limits with the exception of an elevated blood pressure of 135/90 and pulse of 89. Plaintiff wanted to be tested for HIV in the Emergency Room, but it was not recommended by hospital staff. The nurse recommended that plaintiff rest, increase his water intake, and to notify the HSU if the symptoms did not improve.

On July 24, 2012, plaintiff was seen in the HSU by a nurse in sick call. He stated, "I still feel sick about it. My eyes are red, tearing, and I am worried about HIV." Plaintiff's vitals were taken and within normal limits with the exception of a slightly elevated blood pressure of 132/80. The nurse noted an order for an HIV blood test and eye drops to apply as directed. The nurse scheduled a follow-up appointment for the following week. Plaintiff also signed a consent for the HIV antibody test.

On July 25, 2012, the HIV antibody test was administered with negative results. Plaintiff also submitted a Health Service Request (HSR) stating, "My eyes were bloodshot red after taking the medication, my stomach still in pain and it's starting to affect my sleep. All due to me consuming someone else's blood. I need outside attention." (Shakoor-Flint Aff. ¶ 16, Exh. 100, Bates No. 00014, 000016.)

In response to the July 25, 2012 HSR, plaintiff was seen in HSU for sick call on July 26, 2012. His vitals were taken and within normal limits with the exception of an elevated blood pressure of 131/73. The nurse noted that plaintiff's chief complaint was eye redness and stomach ache. Upon examination, the nurse noted that plaintiff's eyes were red with

6

zero drainage, his ears and throat were clear, and his nasal passage was slightly red. Plaintiff denied having allergies. He expressed feeling stressed about the blood exposure and the nurse educated plaintiff regarding blood exposure and relaxation techniques to relieve stress. The doctor ordered eye drops for plaintiff and the nurse directed him to report any signs/symptoms and if there was no improvement in his condition to contact HSU. The nurse also referred plaintiff's case to the doctor.

On July 30, 2012, plaintiff submitted an HSR stating, "I need proper medical treatment. I'm requesting outside attention. I am still very sick, with bloodshot eyes, stomach pains, headaches, loss of sleep and appetite. There is something wrong. Please get me proper help." (Shakoor-Flint Aff. ¶ 18, Exh. 100, Bates No. 00015.) In response, plaintiff was seen by the nurse in sick call the next day. His chief complaint remained unchanged. He stated, "I just feel like something is wrong since I ate that blood." Plaintiff's vitals were taken and within normal limits with the exception of an elevated blood pressure of 138/84. The nurse directed plaintiff to report any signs/symptoms if there was no improvement in his condition, and to continue using the eye drops as directed. (Shakoor-Flint Aff. ¶ 19, Exh. 100, Bates No. 00006-00007, 00013.)

On August 1, 2012, at staff's request, plaintiff was seen in HSU by nursing staff for a follow-up appointment regarding his eye redness. He stated that his eyes were doing better. Plaintiff's vitals were taken and with the exception of an elevated blood pressure of 131/75, unremarkable. Although his eyes were still pink, they showed improvement. The nurse educated plaintiff again regarding eye care and advised him to report any signs or symptoms. His medications were refilled.

7

Defendant Shakoor-Flint has never seen or assessed plaintiff. She was not the staff member who called defendant All Saints on July 23, 2012.

Defendant Paquin was not at the institution on July 23, 2012. He was verbally told about the incident, but does not recall when or how. Paquin is not a health care provider and does not possess professional expertise in any area of health care. He does not attempt to set health care policies to be followed within the Bureau of Correctional Health Services but relies on the health care professionals within the Bureau to set such policies. As Warden, Paquin did not serve meal trays to inmates but rather relied on correctional staff to hire inmates to serve food. The hiring authority is given to the Unit Manager via the Housing Unit Sergeants. Paquin was not aware of any hygiene problems with the inmate whose blood was on the food trays prior to the incident on July 24, 2012.

## III. ANALYSIS

**A.     Defendants Paquin and Shakoor-Flint's Motion for Summary Judgment**

Defendants Paquin and Shakoor-Flint contend that plaintiff's medical-care claim should be dismissed because he did not have a serious medical need and because Shakoor-Flint was not deliberately indifferent. They also contend that plaintiff's failure-to-protect claim is subject to dismissal because Paquin was not personally involved in the claim. Plaintiff contends that genuine issues of material fact preclude summary judgment on this claim. He claims that defendant Shakoor-Flint was deliberately indifferent to his medical care and that defendant Paquin knowingly put him in a dangerous situation.

### 1. Medical-Care Claim

"The Eighth Amendment safeguards the prisoner against a lack of medical care that 'may result in pain and suffering which no one suggests would serve any penological purpose.'" Arnett v. Webster, 658 F.3d 742, 750 (7th Cir. 2011) (quoting Rodriguez v. Plymouth Ambulance Serv., 577 F.3d 816, 828 (7th Cir. 2009); see also Estelle v. Gamble, 429 U.S. 97, 103 (1976)). Prison officials violate the Constitution if they are deliberately indifferent to prisoners' serious medical needs. Arnett, 658 F.3d at 750 (citing Estelle, 429 U.S. at 104). Accordingly, a claim based on deficient medical care must demonstrate two elements: 1) an objectively serious medical condition; and 2) an official's deliberate indifference to that condition. Arnett, 658 F.3d at 750 (citation omitted). "Deliberate indifference to serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." Rodriguez, 577 F.3d at 828 (quoting Estelle, 429 U.S. at 103).

I will focus on the deliberate indifference prong of an Eighth Amendment claim. To demonstrate deliberate indifference, a plaintiff must show that the defendant "acted with a sufficiently culpable state of mind," something akin to recklessness. A prison official acts with a sufficiently culpable state of mind when he or she knows of a substantial risk of harm to an inmate and either acts or fails to act in disregard of that risk. Roe v. Elyea, 631 F.3d 843, 857 (7th Cir. 2011). Deliberate indifference "is more than negligence and approaches intentional wrongdoing." Arnett, 658 F.3d at 759 (quoting Collignon v. Milwaukee Cnty., 163 F.3d 982, 988 (7th Cir. 1998)). It is not medical malpractice; "the Eighth Amendment does not codify common law torts." Duckworth v. Ahmad, 532 F.3d 675, 679 (7th Cir. 2008).

"A jury can infer deliberate indifference on the basis of a physician's treatment decision [when] the decision [is] so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." Arnett, 658 F.3d at 759 (quoting Duckworth, 532 F.3d at 679). A plaintiff can show that the professional disregarded the need only if the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, that "no minimally competent professional would have so responded under those circumstances." Roe, 631 F.3d at 857 (quotation marks omitted). However, a prisoner "need not prove that the prison officials intended, hoped for, or desired the harm that transpired." Walker v. Benjamin, 293 F.3d 1030, 1037 (7th Cir. 2002). "Nor does a prisoner need to show that he was literally ignored." Arnett, 658 F.3d at 759 (citing Greeno v. Daley, 414 F.3d 645, 653 (7th Cir. 2005)). That the prisoner received some treatment does not foreclose his deliberate indifference claim if the treatment received was "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate his condition." Arnett, 658 F.3d at 759 (quoting Greeno, 414 F.3d at 653). However, deliberate indifference is a high standard; it requires proof that the state officials actually knew of the inmate's serious medical need and that they disregarded it. Walker, 293 F.3d at 1037.

Here, plaintiff challenges the decision to not send him to the Emergency Room at All Saints after he ingested another inmate's blood on July 23, 2012. It is undisputed that following the incident, an RCI staff member called defendant All Saints regarding the potential blood exposure. The hospital advised that it would not treat the inmates because the amount of blood ingested was small and stomach acids would minimize exposure. In addition, anything that would be done at the hospital for blood exposure could be done at

10

RCI. The decision not to send plaintiff to the hospital was based on the nurse's assessment and the recommendation of Emergency Room personnel. Plaintiff was seen and assessed after he reported ingesting the blood. The next day, an HIV test was ordered and plaintiff tested negative. In addition, plaintiff's complaints about his red eyes were addressed and HSU educated him on blood exposure and stress relief exercises relative to his anxiety over the incident.

Courts defer to a medical professional's treatment decisions "unless 'no minimally competent professional would have so responded under those circumstances.'" Sain v. Wood, 512 F.3d 886, 894-95 (7th Cir. 2008) (quoting Collignon, 163 F.3d at 988; see Jackson v. Kotter, 541 F.3d 688, 698 (7th Cir. 2008). Plaintiff would have preferred to have been treated at defendant All Saints following the incident on July 23, 2012. However, there is no indication that the decision to treat him RCI was anything other than a reasonable decision under the circumstances, especially considering that he received the same treatment there that he would have received at All Saints. A course of treatment violates the Eighth Amendment only when it departs so radically from the standards of the profession that it falls outside the bounds of the defendant's professional judgment. See King v. Kramer, 680 F.3d 1013, 1018-19 (7th Cir. 2012). The record shows that RCI medical staff treated plaintiff following the incident and reasonably addressed his concerns in the days after the incident. Therefore, plaintiff's medical care claim against defendant Shakoor-Flint fails.

### 2. Failure-to-Protect Claim

The Constitution imposes on prison officials the duty to protect those in their charge from harm from other prisoners. Dale v. Poston, 548 F.3d 563, 569 (7th Cir. 2008) (citing

Mayoral v. Sheahan, 245 F.3d 934, 938 (7th Cir. 2001)). However, an inmate does not have a claim "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). The deliberate indifference test has both objective and subjective prongs, the former requiring a grave risk and the latter requiring actual knowledge of that risk. Dale, 547 F.3d at 569 (citing Greeno v. Daley, 414 F.3d 645, 653 (7th Cir. 2005)). Once prison officials know about a serious risk of harm, they have an obligation "to take reasonable measures to abate it." Borello v. Allison, 446 F.3d 742, 747 (7th Cir. 2006). An official's response may be reasonable even if it fails to avert the harm. Id.

Plaintiff alleges that defendant Paquin allowed the inmate who contaminated the food tray with blood to keep his food service job despite his reputation for intentionally contaminating food trays and for being unsanitary. However, defendant Paquin was not aware of any hygiene problems with the inmate in question prior to the incident. Paquin was not personally involved in serving meals or hiring inmates to work in food service.

Only a defendant who is personally responsible for depriving the plaintiff of a constitutional right may be held liable under § 1983. Grieveson v. Anderson, 538 F.3d 763, 778 (7th Cir. 2008). If someone else has committed the act that resulted in the constitutional deprivation, then the defendant is personally responsible, and thus liable under § 1983, only if he knows about the other person's act, has a realistic opportunity to prevent it, but deliberately or recklessly fails to do so. Lewis v. Downey, 581 F.3d 467, 472

12

(7th Cir. 2009). Because the the undisputed facts reveal that defendant Paquin was not personally involved in plaintiff's failure to protect claim, the claim will be dismissed.

B. **Defendant All Saints' Motion for Summary Judgment**

Defendant All Saints contends that it is entitled to summary judgment because, as an off-site independent hospital, it had no duties to plaintiff under the Eighth Amendment. It further contends that, even if it did, plaintiff did not have a serious medical need and All Saints was not deliberately indifferent. Plaintiff's response does not address All Saints' arguments.

Private hospital liability to prisoners under the Eighth Amendment is not unprecedented. See Rodriguez v. Plymouth Ambulance Serv., 577 F.3d 816, 823 (7th Cir. 2009). I will not therefore dismiss All Saints merely because it is an off-site independent hospital. However, All Saints is subject to dismissal because there is no indication of deliberate indifference on the part of the hospital. Rather, someone at All Saints recommended to not bring the prisoners to the Emergency Room because the blood exposure was small and RCI could provide the same treatment that they would receive at the hospital. As set forth herein, these facts do support an inference of deliberate indifference. Therefore, I will grant defendant All Saints' motion for summary judgment.

**THEREFORE, IT IS ORDERED** that defendants Paquin and Shakoor-Flint's motion for summary judgment (Docket # 28) is **GRANTED**.

**IT IS FURTHER ORDERED** that defendant All Saints' motion for summary judgment (Docket # 34) is **GRANTED**.

**IT IS FURTHER ORDERED** that defendant John Doe is **DISMISSED**.

**IT IS FURTHER ORDERED** that this case is **DISMISSED**.

Dated at Milwaukee, Wisconsin, this 18th day of July, 2014.

                                      s/ Lynn Adelman
                                      _____
                                      LYNN ADELMAN
                                      District Judge